J-A16018-21

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

| | | |
|---|---|---|
| COMMONWEALTH OF PENNSYLVANIA | : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| | : | |
| v. | : | |
| | : | |
| EDIA ANTONIO LAWRENCE | : | |
| | : | |
| Appellant | : | No. 1017 MDA 2020 |

Appeal from the Judgment of Sentence Entered June 30, 2020
In the Court of Common Pleas of York County Criminal Division at No(s):
CP-67-CR-0003473-2017

BEFORE:   KUNSELMAN, J., McCAFFERY, J., and STEVENS, P.J.E.[*]

MEMORANDUM BY McCAFFERY, J.:   **FILED: AUGUST 19, 2021**

Edia Antonio Lawrence (Appellant) appeals from his judgment of sentence imposed in the York County Court of Common Pleas following his jury convictions of one count each of second degree murder, conspiracy, burglary, simple assault, and terroristic threats, and two counts of robbery.[1] On appeal, he challenges: (1) the evidence identifying him as the perpetrator; and (2) the Commonwealth's closing arguments and the trial court's jury instructions concerning second degree murder.   After careful review, we affirm.

_____

[*] Former Justice specially assigned to the Superior Court.

[1] 18 Pa.C.S. §§ 2502(b), 903, 3502(a)(1)(i), 2701(a)(3), 2706(a)(1), 3701(a)(1)(i), 3701(a)(1)(ii), respectively.

Appellant was accused of committing, along with two cohorts, a home invasion, robbery, and the homicide of Appellant's ex-girlfriend, Ahshantianna Johnson (Victim), at her home in Mount Wolf, Pennsylvania. Appellant was charged with one count each of first degree murder, second degree murder, burglary, simple assault, and terroristic threats, and two counts each of robbery and conspiracy.[2] This case proceeded to a jury trial on March 10, 2020, where the Commonwealth presented the following evidence.

The Victim's mother, Noemi Capo (Capo), testified that on March 25, 2017, around 2:15 a.m., three men, all wearing gloves and masks, entered her home in Mount Wolf. N.T., Jury Trial Vol. II, 3/10/20, at 194-95, 206. Capo, her two sons, and the Victim all lived there, but at the time, only Capo was home. *Id.* at 196-97. Capo knew Appellant as the Victim's ex-boyfriend, and referred to him as "Richie," a name that Appellant used. *Id.* at 200, 205; N.T. Jury Trial Vol. IIII,[3] 3/12/20, at 665. Capo identified Appellant by his voice, mannerisms, familiarity, and by "the things he was asking for in [her] house." N.T., 3/10/20, at 138, 224. For instance, Appellant knew what sports Capo's sons played, knew where her sons kept their PlayStation 4, and had "very distinctive" "beady eyes." *Id.* at 138, 206, 228, 249. Appellant previously visited Capo's home "around 50" times and Capo spoke with him

---

[2] 18 Pa.C.S. § 2502(a).

[3] The cover of this transcript is entitled "Jury Trial Vol. IIII" (and not "IV"). For ease of review, we use this title in our citation.

for a "couple [of] minutes" "[a] month" before the incident. *Id.* at 200-01. Capo also heard his voice about "five times" when he had been at her home. *Id.*

Appellant directed Capo to call the Victim while holding a "knife and a [metal] bat" and told her if she "yell[ed] or ma[de] any kind of noise, he would bash [her] head in." N.T., 3/10/20, at 212. During the incident, Appellant directed one of his co-conspirators to retrieve duct tape from the car, which he then placed on the entertainment stand. *Id.* at 230. Capo identified the knife and duct tape at trial. *Id.* at 229, 231. After Capo asked the Victim to come to her home, Appellant took her phone. *Id.* at 215.

After luring the Victim home, Capo asked to use the bathroom. N.T., 3/10/20, at 219-20. When Appellant allowed her to do so, she "ran outside the house." *Id.* As she was running from the home, she saw the Victim "drive [towards the house] in her car." *Id.* at 221. Capo knocked on several neighbors' doors until neighbor Troy McClane answered and she begged him to call the police. *Id.* at 222. McClane drove Capo back to her home, where police had already arrived. *Id.* at 223. Capo immediately told police one of the perpetrators was a man named "Richie." *Id.* at 134, 138. Capo identified Appellant as "Richie" at trial. *Id.* at 205. Items stolen from the home include televisions, the Victim's sneakers, two jackets, including one belonging to the Victim, money, a PlayStation 4 remote control, and Capo's phone. *Id.* at 224, 258.

The Commonwealth presented the following testimony of Quincy Lamarr Gray, Capo's neighbor. Between 2:00 and 3:00 a.m. on March 25, 2017, he "heard a loud banging noise and some arguing." N.T., 3/10/20, at 287. He heard "at least one or two male voices and a female voice." *Id.* One of the voices said "help me." *Id.* at 288. Gray also saw a "black figure in the grass[.]" *Id.* at 288-89.

Northeast Regional Police Officer Shaun Goodman and Newberry Township Police Officer Breyer[4] responded to the scene at Capo's home. N.T., 3/10/20, at 128-29. The two officers entered the front door, which was open. *Id.* at 130-31. Officer Goodman saw the back door was also open with "a key in a dead bolt." *Id.* The officers described the home as in "utter disarray." *Id.* at 132-33. Upstairs, Officer Goodman saw "[d]rawers pulled out" as if "someone was looking for something[.]" *Id.* at 133, 135.

During his investigation, Officer Goodman heard "an audible groan coming from the backyard[.]" N.T., 3/10/20, at 131. There, he found the Victim "laying in the lawn[ ]" with "multiple lacerations across her face." *Id.* at 131-32. The Victim was alive but unresponsive, her face was "covered in blood," and she was "gurgling[.]" *Id.* at 132. Police found a mask in the backyard where the Victim was found; Capo later identified this mask as the one worn by Appellant. *Id.* at 159, 232.

---

[4] Officer Breyer's first name is not apparent from the record.

The Victim was transported to the hospital and passed away five days later from her injuries. N.T., 3/10/20, at 132, 223. Forensic Nurse Brandi Castro and Medical and Forensic Pathologist Michael Johnson testified the Victim sustained

> swelling and bruising on her face and arms, two black eyes, lacerations on her head and hands, a fractured face and skull, and brain swelling that would have resulted in a significant brain injury had she survived. Her cause of death was determined to be homicide by head trauma, consistent with trauma from a heavy blunt instrument.

Trial Ct. Op., 11/10/20, at 4-5; N.T., Jury Trial Vol. III, 3/11/20, at 464-471, 491, 493-95, 497-98.

The police collected as evidence, *inter alia*, a wooden bat, a metal bat, a roll of duct tape, a dead bolt key, and a knife from inside the home and a scarf, blood, and the mask, described above, from the backyard. N.T., 3/10/20, at 158-59; N.T., 3/11/20, at 504, 532. Forensic Biologist Sears examined a DNA sample from both the mask found in the back yard and the duct tape and concluded that Appellant could not be excluded as a major contributor. N.T., 3/12/20, at 631, 634-35, 638-39.

Tania Butler, a former classmate of Appellant, testified that Appellant had "multiple" phone numbers that she used to communicate with him. N.T., 3/10/20, at 331, 335. In a May 22, 2017, police interview, Butler provided two phone numbers used by Appellant: (917) 605-6XX8 and (845) 694-9XX3. *Id.* at 335. Butler testified that both phone numbers belonged to Appellant and no one else used them. *Id.* at 336. Pennsylvania State Trooper James

Welsch was qualified as an expert in "cell phone technology and mapping of cell phone data." N.T., 3/11/20, at 384. He testified the phone associated with the number (845) 694-9XX3 had "no subscriber information[,]" but that on March 25, 2017, that phone "traveled from the northeast region of [Pennsylvania], to the Mount Wolf area . . . and . . . back up to the northeast." *Id.* at 403, 405-06. The phone was in the Mount Wolf area at 2:15 a.m. *Id.* at 403. Northeast Regional Detective Brian O'Melko testified that he reviewed contacts in the Victim's phone and the phone number (845) 694-9XX3 was saved under Appellant's first name. *Id.* at 512-13.

"During the course of the investigation[,]" Detective O'Melko interviewed a potential suspect, Konica Ashton. N.T., 3/11/20, at 542. Ashton posted a video to Facebook, in which she stated she killed the Victim. *Id.* at 543. However, "at the end [of the same video], she said she was lying[.]" *Id.*

The Commonwealth also presented witnesses Shaun Whack and Dakota Gilbeau, who testified as follows:

> [Whack] testified that he sold marijuana for Appellant — he would sell the marijuana and owe a cut of the money back to Appellant. Appellant sent women to pick the money up rather than picking it up himself. A couple weeks prior to the incident, [the Victim] picked up a little over $3, 000 from Whack. Soon after, Appellant called Whack and stated that [the Victim] "had not contacted him and that he was going to smack the shit out of her for playing with his money." Whack also spoke with Appellant after hearing of [the Victim's] death, and Appellant told Whack that "the job was done" and "it got handled."
>
> [Gilbeau] testified that prior to the incident at [ ] Capo's home, Appellant asked him to go to [the Victim's] house and see if she

- 6 -

was home. Appellant told Gilbeau that the reason he was looking for [the Victim] was that [she] owed Appellant $3,000.

Trial Ct. Op. at 4-5 (footnotes omitted and paragraph break added).

York County Sheriff's Office Corporal Gary Landis testified that on April 19, 2017, when Appellant was brought in for arraignment, he overheard Appellant on a phone call directing the recipient "to get[ ] a Play[S]tation 4 controller from a child's room" and to "get rid of it." N.T., 3/11/20, at 545-47.

Appellant testified at trial in his own defense. He stated that on March 24, 2017, he went to work in New York and received two speeding tickets that day. N.T., 3/12/20, at 665. Appellant admitted to selling marijuana, but contested the testimony of Commonwealth witness Whack, denying any "partnership" wherein Appellant would provide or loan Whack marijuana to sell. *Id.* at 666. Whack "either had money to pay for [marijuana] or we didn't talk." *Id.* at 666-67. Appellant claimed this was a "theory the [Commonwealth] wanted you to hear." *Id.* at 666. Appellant admitted that before the incident, the Victim agreed to do him a favor and "pick up [ ] weed and pick up [ ] money" from people buying marijuana from him, including Whack. *Id.* at 668. The Victim told Appellant she was "going to keep the money" belonging to Whack. *Id.* at 668-69. In response, Whack allegedly called Appellant, angry about the money, and "[d]ays later, [the Victim] was killed." *Id.* at 669-70.

Appellant was found guilty by a jury of one count each of second degree murder, conspiracy to commit robbery, burglary, simple assault, and

terroristic threats, and two counts of robbery. Appellant was sentenced on March 13, 2020, to life without parole for second degree murder and a consecutive sentence of five to 15 years' incarceration for conspiracy.

Appellant filed a post-sentence motion for arrest of judgment or a new trial, which the trial court denied on July 23, 2020. This timely appeal[5] followed. Appellant timely complied with the trial court's order to file a concise statement of matters complained of on appeal pursuant to Pa.R.A.P. 1925(b).

Appellant raises four issues on appeal:

[1.] Whether the evidence was insufficient to convict Appellant of the robbery of [the Victim] or the robbery of [Capo] or burglary?

[2.] Whether the evidence was insufficient to convict [ ] Appellant of second[ ]degree murder?

3.Whether the evidence was insufficient to establish criminal conspiracy to commit robbery?

4. Whether the [Commonwealth's] closing argument and the jury instructions violated Appellant's due process rights by amending the information to conform to the proof at trial and prejudicing Appellant by asserting that the motive for the robbery and murder was revenge over nonpayment of a drug debt which is not a predicate felony for second degree murder?

Appellant's Brief at 2-3.[6]

---

[5] Appellant filed a notice of appeal from both his judgment of sentence and the order denying his post sentence motion. "In a criminal action, appeal properly lies from the judgment of sentence made final by the denial of post-sentence motions." *Commonwealth v. Shamberger*, 788 A.2d 408, 410 n.2 (Pa. Super. 2001) (*en banc*) (citation omitted), *appeal denied*, 800 A.2d 932 (Pa. 2002).

[6] Appellant's claims have been reordered for ease of review.

Preliminarily, we note:

> A claim challenging the sufficiency of the evidence is a question of law. Evidence will be deemed sufficient to support the verdict when it establishes each material element of the crime charged and the commission thereof by the accused, beyond a reasonable doubt. Where the evidence offered to support the verdict is in contradiction to the physical facts, in contravention to human experience and the laws of nature, then the evidence is insufficient as a matter of law. When reviewing a sufficiency claim the court is required to view the evidence in the light most favorable to the verdict winner giving the prosecution the benefit of all reasonable inferences to be drawn from the evidence.

***Commonwealth v. Widmer***, 744 A.2d 745, 751 (Pa. 2000) (citations omitted).

In Appellant's first three claims on appeal, he avers "[t]he evidence is insufficient to prove [he] was the individual who killed" the Victim, robbed Capo, or participated in the home invasion. Appellant's Brief at 15, 23, 24. Appellant acknowledges Capo's identification of him as one of the three masked assailants, but maintains, *inter alia*, the home invaders wore masks, his DNA was not on the Victim's clothing or fingernails, and there was no subscriber information for the cell phone number (845) 694-9XX3. ***Id.*** at 15-16. Appellant also references his trial testimony that he did not participate in the home invasion. ***Id.*** at 20-21. Appellant asserts the only evidence that he participated came from Capo's testimony, which was insufficient because it was given "under stressful circumstances." ***Id.*** at 21. Appellant further argues "Capo's identification testimony is offset" by Detective O'Melko's testimony "that there was another suspect[,]" Konica Ashton, who stated "she

was the killer" in a Facebook video. *Id.* at 25. Appellant reasons that because "the other conspirators were not identified[,] there was no evidence of the unity of purpose or intent to achieve a common goal," for purposes of the conspiracy charge. *Id.* at 26. Finally, Appellant claims the expert testimony regarding Appellant's DNA "is not proof beyond a reasonable doubt" that he was the perpetrator. Appellant's Brief at 21, *citing* **Commonwealth v. Long**, 368 A.2d 265 at 267 (Pa. 1977). Appellant insists that based on the evidence presented, the jury could only "guess" who committed the robbery and thus, he must be acquitted. *Id.* at 19, 25-26.

First, we conclude Appellant's arguments go to the weight, not sufficiency, of the evidence. **See Commonwealth v. Cain**, 906 A.2d 1242, 1245 (Pa. Super. 2006) ("[A]ny uncertainty in an eyewitness's identification of a defendant is a question of the weight of the evidence, not its sufficiency."). Appellant concedes there was evidence identifying him — Capo's trial testimony — but essentially argues it should not have been believed. **See Commonwealth v. Morgan**, 913 A.2d 906, 909 (Pa. Super. 2006) ("[A] true weight of the evidence challenge concedes that sufficient evidence exists to sustain the verdict but questions which evidence is to be believed[ and] contests the weight that is accorded the testimonial evidence."). Therefore, regardless of Appellant's framing his claims as challenges to the sufficiency of evidence, we evaluate his arguments pursuant to weight of the evidence principles.

This Court has stated:

> [T]he weight of the evidence is exclusively for the finder of fact who is free to believe all, part, or none of the evidence and to determine the credibility of the witnesses. An appellate court cannot substitute its judgment for that of the finder of fact. Thus, we may only reverse the lower court's verdict if it is so contrary to the evidence as to shock one's sense of justice. Moreover, where the trial court has ruled on the weight claim below, an appellate court's role is not to consider the underlying question of whether the verdict is against the weight of the evidence. Rather, appellate review is limited to whether the trial court palpably abused its discretion in ruling on the weight claim.

*Commonwealth v. Shaffer*, 40 A.3d 1250, 1253 (Pa. Super. 2013) (citation omitted). In-court testimony identifying the defendant as the perpetrator is sufficient by itself to establish the identity element of a crime. *See Commonwealth v. Johnson*, 180 A.3d 474, 478 (Pa. Super. 2018) (one witness's identification is sufficient for conviction and appellant's assertion that his own testimony contradicted the identification is irrelevant in a sufficiency analysis).

Furthermore, a weight of the evidence claim on appeal must have been properly preserved. *See* Pa.R.Crim.P. 607(A)(1)-(3). To properly preserve a weight of the evidence claim, Appellant must raise it with the trial judge in a motion for a new trial: [ ] orally, on the record, at any time before sentencing; [ ] by written motion at any time before sentencing; or [ ] in a post-sentence motion." *Id.* "Failure to properly preserve the claim will result in waiver, even if the trial court addresses the issue in its opinion." *Commonwealth v. Rivera*, 238 A.3d 482, 497 (Pa. Super. 2020) (citation omitted). *See also id.* at 498 ("[W]hen an appellate court reviews a weight claim, the court is

reviewing the exercise of discretion by the trial court, not the underlying question of whether the verdict was against the weight of the evidence.").

Here, Appellant failed to preserve any of the claims he now raises on appeal.[7] Thus, his present claims raised are waived. **See** Pa.R.Crim.P. 607(A)(1)-(3); **Rivera**, 238 A.3d at 497.

Moreover, had Appellant preserved any weight of the evidence claims, he would not be entitled to relief. Second degree murder is defined as the following:

> A criminal homicide constitutes murder of the second degree when it is committed while defendant was engaged as a principal or an accomplice in the perpetration of a felony.
>
> \*   \*   \*
>
> "Perpetration of a felony." — The act of the defendant in engaging in or being an accomplice in the commission of, or an attempt to commit, or flight after committing, or attempting to commit robbery, rape, or deviate sexual intercourse by force or threat of force, arson, burglary or kidnapping.

18 Pa.C.S. § 2502(b), (d).

In relevant part, robbery is defined as:

---

[7] Although Appellant filed a post-sentence motion, the claims raised therein were: (1) "drug dealing is not a predicate felony for second degree murder;" (2) the court erred in not giving a jury instruction "on the lesser included offense of robbery, which would be theft;" (3) there was no evidence that the Victim was beaten to death **during** the robbery or burglary, and instead, the evidence indicated she was beaten **after** the robbery or burglary; (4) there was no evidence that Appellant robbed the Victim; (5) the Commonwealth's presentation of the DNA evidence violated the Confrontation Clause; and (6) the Commonwealth did not identify any of the co-conspirators. Appellant's Memorandum of law Support Post-Sentence Motion, 7/17/20, at 9-10.

> (1) A person is guilty of robbery if, in the course of committing a theft, he:
>
>> (i) inflicts serious bodily injury upon another[.]

18 Pa.C.S. § 3701(a)(1)(i). "Serious bodily injury" is defined as a bodily injury which creates a substantial risk of death or which causes serious, permanent disfigurement, or protracted loss or impairment of the function of any bodily member or organ. 18 Pa.C.S. § 2301.

> Conspiracy is defined as follows:
>
> A person is guilty of conspiracy with another person or persons to commit a crime if with the intent of promoting or facilitating its commission he:
>
>> (1) agrees with such other person or persons that they or one or more of them will engage in conduct which constitutes such crime or an attempt or solicitation to commit such crime; or
>>
>> (2) agrees to aid such other person or persons in the planning or commission of such crime or of an attempt or solicitation to commit such crime.

18 Pa.C.S. § 903(a)(1)-(2). The Commonwealth need not identify, arrest, or prosecute a defendant's co-conspirators to prove he participated in a conspiracy. *Commonwealth v. Fremd*, 860 A.2d 515, 521-22 (Pa. Super 2004).

On the night of the home invasion, Capo immediately identified Appellant to police as one of the masked assailants. She also identified him at trial, explaining that she recognized him due to, *inter alia*, his voice, eyes, and knowledge of her home. N.T., 3/10/20, at 138, 206. Under Appellant's threat of death, Capo was forced to lure the Victim home. This identification alone was sufficient to convict Appellant if believed by the jury. *See Shaffer*,

A.3d at 1253; *see Johnson*, 180 A.3d at 478. Upon arrival, the Victim was beaten to death, and a mask with Appellant's DNA was found in the backyard near her body. The Commonwealth also presented Whack's testimony providing Appellant's motive to harm the Victim and steal from her, as well as forensic cell phone technology expert testimony circumstantially establishing Appellant's proximity to the crime scene.

Although Appellant testified that he was not one of the perpetrators, the jury was free to reject his testimony, and was free to believe all, part, or none of the Commonwealth's evidence. *See Shaffer*, A.3d at 1253. The jury clearly chose to believe the Commonwealth's evidence and reject Appellant's self-serving testimony. Thus, no relief is due.

In his final claim on appeal, Appellant challenges the following closing argument by the Commonwealth:

> [The Victim] had [Appellant's] money. She had $3,000[.] [Gilbeau] said [Appellant] was looking for $3,000. That's your **motive**.
>
> *   *   *
>
> This is [ ] a second[ ]degree murder case. What is different about second as compared to first? Second[ ]degree murder is a murder that occurs in conjunction with another felony. In this case, we have **two other felonies** that are alleged: One is **burglary** and the other is **robbery**.

Appellant's Brief at 27-28, *quoting* N.T., 3/12/20, at 718, 723 (emphases added).

Appellant avers the Commonwealth's closing argument "confused the jury," leading it to believe he "killed [the Victim] over her failure to pay a drug debt." Appellant's Brief at 29. Appellant states the Commonwealth's "insist[ing this was] the motive" for the crime caused a "reasonable probability" that the jury convicted him of second degree murder "based on a crime that is not among the predicate felonies covered by the statute." *Id.*

Appellant further challenges the following jury instruction regarding motive:

> You have heard [Appellant] was involved in selling marijuana. **He is not on trial for that offense**. The evidence is before you for a **limited** purpose[,] tending to show [Appellant's] **motive**, opportunity, intent preparation, plan, knowledge identity, absence of mistake[,] or lack of access. In this case, the Commonwealth says **this was the motive** for the crime.

Appellant's Brief at 28, *quoting* N.T., 3/12/20, at 741 (emphases added).

Appellant also avers the trial court's following instructions on second degree murder were "conflict[ing]:"

> [Appellant] has been charged with second degree murder, that is, felony murder. And to find him guilty, you must find the following three elements have been proven beyond a reasonable doubt: First, that [Appellant]killed [the Victim]; second, that the act was done while committing a robbery and/or burglary; third, that [Appellant] was acting with malice.
>
> You may find [Appellant] was acting with malice if you are satisfied beyond a reasonable doubt that they committed the robbery or burglary, because robbery is a crime that's inherently dangerous to human life. As is burglary[;] there does not have to be any additional proof of malice.

Appellant's Brief at 29, *quoting* N.T., 3/12/20, at 752. We conclude no relief is due.

- 15 -

Our standard of review for a claim of prosecutorial misconduct is limited to whether the trial court abused its discretion. In considering this claim, our attention is focused on whether the defendant was deprived of a fair trial, not a perfect one.

[A] prosecutor's arguments to the jury are [generally] not a basis for the granting of a new trial unless the unavoidable effect of such comments would be to prejudice the jury, forming in their minds fixed bias and hostility towards the accused which would prevent them from properly weighing the evidence and rendering a true verdict.

A prosecutor must have reasonable latitude in fairly presenting a case to the jury and must be free to present [his] arguments with logical force and vigor. The prosecutor is also permitted to respond to defense arguments. Finally, in order to evaluate whether the comments were improper, we do not look at the comments in a vacuum; rather we must look at them in the context in which they were made.

*Commonwealth v. Solomon*, 25 A.3d 380, 383 (Pa. Super. 2011) (citations omitted).

The Pennsylvania Supreme Court has stated:

When evaluating jury instructions, the charge must be read as a whole to determine whether it was fair or prejudicial. The trial court has broad discretion in phrasing its instructions, and may choose its own wording so long as the law is clearly, adequately, and accurately presented to the jury for its consideration.

*Commonwealth v. Prosdocimo*, 578 A.2d 1273, 1274 (Pa. 1990).

Further, we must address if Appellant preserved a claim that the trial court erroneously gave a jury instruction. Appellant must object to the erroneous instruction after it is given and before the jury begins deliberation. *See* Pa.R.Crim.P. 647(C) ("No portions of the charge nor omissions from the charge may be assigned as error, unless specific objections are made thereto before the jury retires to deliberate."); *see Commonwealth v. Parker*, 104

A.3d 17, 29 (Pa. Super. 2014) (defendant did not preserve an erroneous jury instruction claim for appeal when he did not object after the instruction was given and before the jury began deliberations).

Here, after the trial court instructed the jury, it asked if any "additions or corrections" were necessary. N.T., 3/12/20, at 760. Appellant's trial counsel made no such requests. After making the Commonwealth's requested additions, the trial court asked if counsel was "satisfied." *Id.* at 763. Appellant's counsel replied yes. *Id.* Accordingly, we find the issue waived. *See* Pa.R.Crim.P. 647(C); *Parker*, 104 A.3d at 29. Additionally, on appeal, Appellant does not cite the place in the record where he raised a timely objection. *See* Pa.R.A.P. § 2117(c) (requiring statement of case to specify state of proceedings at which issue sought to be reviewed on appeal was raised), 2119(e) (requiring same of argument section of appellate brief).

Moreover, even if Appellant had preserved his objection, no relief would be due. We would conclude the jury instructions, read as a whole, were not prejudicial and the law was adequately presented to the jury for its consideration. *See Prosdocimo*, 578 A.2d at 1274. In arguing that recovering a drug debt is an improper predicate offense for second degree murder, Appellant conflates the "why" and the "how." For purposes of our sufficiency analysis, the "why" – why Appellant broke into this home and brutalized its inhabitants – is less important than the "how" – the evidence, if credited by the jury (which it plainly was), establishes that a) the Victim was killed, and b) she was killed during a break-in, and the perpetrators took items

of discernable, non-negligible value during that break-in.[8]  Even if the perpetrators committed this crime for a bizarre reason not contemplated by any criminal statute, it is the "how" that establishes the propriety of application of the second degree murder statute.

We likewise disagree with Appellant's contention that the trial court's instruction for second degree murder was "hopelessly confusing."  **See** Appellant's Brief at 29.  Appellant's challenge to the jury instruction seems to focus on the trial court's use of the word "they" – when the court stated that the jury could convict Appellant of second-degree murder if the jury found "**they** committed the robbery or burglary."  **See** Appellant's Brief at 29 (emphasis added).  Appellant asserts that "[t]his conflicts with the previous instructions that the jury had to find that Appellant himself committed the murder."  **Id.**  Our review of the instruction as a whole reveals this focus as quixotic.

Initially, we note that the word "they" functions in both the singular and the plural, and has long done so.  For example:

> There's not a man I meet but doth salute me
> As if I were their well-acquainted friend

William Shakespeare, *A Comedy of Errors*, Act IV, Scene 3.  Thus, this supposed conflict is not created by the instruction itself, but by Appellant's

---

[8] "Under Pennsylvania law the crime of burglary is defined as an unauthorized entry with the intent to commit a crime after entry."  **Commonwealth v. Alston**, 651 A.2d 1092, 1094 (Pa. 1994) (citations omitted); **see also** 18 Pa.C.S. § 3502.

strained reading of it. This portion of the charge is faithful to the standard charge for second degree murder, Pa. SSJI (Crim), §15.2502B. This jury instruction, read as a whole, was not prejudicial and the law was adequately presented to the jury for its consideration. *See Prosdocimo*, 578 A.2d at 1274.

Regarding the Commonwealth's closing argument concerning motive, we agree with the trial court that Appellant "conflates motive with the explicitly stated elements of the crime charged." Trial Ct. Op. at 17. Additionally, the Commonwealth presented its argument regarding motive logically and without creating hostility towards Appellant. Thus, this argument is meritless. *See Solomon*, 25 A.3d at 383. No relief is due.

Judgment of sentence affirmed.

Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary

Date: 08/19/2021